Good morning, and may it please the Court, my name is Brett Hemd. I represent Plaintiff Appellant Tatrina Solomon. We're asking this Court to reverse on two issues. The first is a statutory interpretation issue, first impression. This is the issue of the meaning of the phrase personally identifiable information within the VPPA. The second issue is the denial of leave to amend. And I'd like to start with the leave to amend issue. This Court strongly favors a liberal grant of leave, especially after a dismissal under Rule 12b-6. And the law in this Court was recently summarized in the Mandela case. Quote, in the absence of a valid rationale, like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12b-6 and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies. What if you know from the opposing party's motion to dismiss what the alleged deficiencies are? Does that never change the situation? If you have been put on notice, not by the district court, but at least from your adversary's moving papers? So, Your Honor, our understanding is that no, that would not change the situation. Unless the district court has given some indication of its views as to the pleading deficiencies, it's not sufficient notice. And so to simultaneously dismiss, if the district court does that at the very same time that the court... You only made the request in a footnote, right? That's correct, Your Honor. You then offer a proposed amended complaint or suggest how you might plead something differently? That's correct, Your Honor. In a footnote, we said that to the extent the district court found any pleading deficiencies, we would like an opportunity to address those. Is that sufficient? Yes, Your Honor, I believe that it is. I understand that the district court here was concerned about the fact that this was in a footnote as opposed to the body of a brief. But I think this court's precedents make clear that that is not a basis on which to deny leave to amend or to affirm a denial of leave to amend. This court is concerned about issues like futility, bad faith, undue delay, and undue prejudice. And if you were allowed to amend, what additional allegations would you assert? Yes, Your Honor. So as we say in our opening brief, I think very clearly, we would directly cure both of the pleading deficiencies identified by the district court. First, on the issue of personally identifiable information, we would allege that Ms. Solomon's name appeared on her public Facebook profile. That would directly address and cure that pleading deficiency. Second, on the issue of live versus prerecorded video information, we would very clearly You don't even address that issue in your brief on appeal, do you? The prerecorded issue. We don't, Your Honor, except to say that we're not challenging the district court's determination, the legal conclusion on that issue. We believe we can cure that by amendment. We do address the amendment we would make. If you don't even discuss it in your brief on appeal, I mean, what's the basis for arguing that you would make some points if this were remanded? So, Your Honor, we address the amendment that we would make on that issue. We say that we would amend the complaint specifically to allege that Ms. Solomon watched indisputably prerecorded videos. And that was the district court's concern that there's a distinction between live videos, which arguably are not covered by the VPPA, and prerecorded videos, which are covered. So, the way we would approach that, rather than challenging that determination by the district court, we're willing to accept that and to just amend the complaint to say she watched prerecorded videos. That would cure that deficiency. That's on page 3738 of your brief, your blue brief. I believe so, Your Honor. Let me ask you, the ability to plead that her name appears on her Facebook page and, therefore, would make her identifiable by anyone, not just Facebook. If we allow you to go back and replete, then we don't have to decide the question of whether or not a personally identifiable information is identifiable to the recipient or to the world at large. We don't have to decide which side of the circuit split to go on yet in this case. Is that your position? Well, I think that's correct, Your Honor, although it would put the district court, I think, and other district courts in the unusual situation of having to continue to look at out-of-circuit precedent. Well, that may be in other cases, but not in this case, right? You would be willing to go forward on the fact that your client's Facebook page identifies her by name? We would, yes, Your Honor. I think there is another practical issue to consider with that, which is if the case proceeds and comes back at some point later on appeal, that decision by the district court to require Ms. Solomon to plead her name could be presented to this court again at a later point. Why is that? I thought your view is that if you get to amend your complaint and say that her name is on her Facebook page, such that anybody could plug in the ID into a URL and pull it up and see her name, that you win under either the First Circuit's test or the Third and Ninth Circuit's test. So how would that come up again in the future in this case? Yes, Your Honor. Other than maybe class certification, but other than that, how would it come up again? I'm not sure, Your Honor, that it would come up other than in class certification. But Your Honor raises a very good point, which is that this could be an issue potentially on class certification. Now, that is perhaps pretty far down the road. But if the requirement that certain information be on the public Facebook page has implications for class certification, that could potentially be an issue on appeal. I mean, you can imagine that the court has said there needs to be an allegation of what information is on the Facebook page, and we're prepared to allege it's the name. What about a photograph? What about an e-mail address? Is that sufficient? And where do you draw those lines? So I do think that could present a future issue, and it's ripe right now for this court. The defendant's pre-motion conference letter identified these issues, and that it failed to identify personal information on her Facebook profile. Live events are not covered. You could very easily have addressed those issues in your opposition papers, and then the district court would have had an opportunity to consider those points back then before this whole appeal. Yes, that's correct, Your Honor. But I don't think there's anything improper about what we did here, which was to say that Ms. Solomon had a legal theory that she wanted to test. Well, I don't know if it's a matter of propriety, but discretion? The district court said discretion to deny leave to appeal under the circumstances? Is it an abuse? Yes, Your Honor. I believe it is an abuse of discretion. And it goes back to Mandela's distillation of this court's precedent. This is from December of last year where the court said this is improper when it's a simultaneous dismissal and denial of leave to amend. There's been no prior notice from the court of the court's views. Yeah, but Mandela, I thought, made a point of saying that they thought it was sort of this was something that people who were before the district court would not have been able to predict that this is the ground on which the case would have been dismissed. It's a little bit different if your opponent files paper saying this is the reason you should dismiss and flags it for you, so then your natural response should be two things. Number one, don't dismiss on that ground. Number two, even if the court agrees with my opponent, I will amend my complaint to fix, to add those things. That's the normal response. And if you made a tactical litigation decision to only fight on one, to put all your eggs in one basket, that's usually a decision you have to live with, right? Well, I don't know about that, Your Honor, because, again, the district court had not expressed any views. These were arguments from defendants, and they made a lot of arguments. So your argument, though, seems to be that you never, ever have to move to amend until after a district court rules because even if your opponent points out the most glaringly obvious deficiencies in your complaint, you aren't obliged to even suggest that you're going to amend in a particular way until the district court agrees with your opponent. That seems to be the implication of your position here, and I don't see how Mandala stands for that. Well, Your Honor, I think our position is a little bit more nuanced than that, which is to say that if there's been no expression of the district court's views and if there's no futility, bad faith, undue delay, or undue prejudice, that we should be given at least one opportunity once the district court has identified what the court believes are the deficiencies in the pleading. Under this liberal policy that's strongly favored in this circuit, there should be one opportunity to amend. If that had been given here, we would have amended to directly cure both of the pleading deficiencies. Well, why don't we do this? Unless there are any other questions from the panel right now, you've reserved two minutes. Yes. Why don't we hear from your opponent, and then we'll come back to you, Mr. Hammond. Thank you, Your Honor. We have counsel for the applee. Mr. Sinani? Yes, Your Honor. Good morning, Your Honors. May it please the Court. When I came here today, I thought that there were really two issues before the Court. One was the pleading standard that ought to be applied for personally identifiable information, or PII on the BPPA. I think what we've heard from counsel is that they've essentially conceded that the ordinary person standard should be applied in this case. I didn't hear that. Well, why don't you proceed as though they didn't concede anything, because I'm not sure I heard that. Even if they conceded, that wouldn't be binding on us. Understood, Your Honor. Then let me start with some general principles. The 1988 BPPA was concerned with a specific harm, disclosing who rented what video. For example, disclosing that Judge Bork rented Casablanca. Going beyond that specific harm to hold that the BPPA bans targeted Internet advertising through the use of cookies, legislates— I mean, I get it. Technological change sometimes outruns a statute. But that doesn't mean that the BPPA only covers the specific factual situation that was present with Judge Bork's confirmation hearing, right? You would agree. They said they didn't define PII as only name, right? Yes, Your Honor. It is the harm that matters and the disclosure. So let me ask you a hypothetical. You advocate the use of the Third and Ninth Circuit's ordinary person standard, is that right? If the court believes it needs to adopt a standard in this case, that's right. I agree. If we needed to get there. My question would be this. Let's assume for the sake of argument a situation very much like Judge Bork's hearing, where, let's say, a streaming operator, Netflix, decides they would like to tell a reporter what movies have been viewed by the 50 judicial nominees who are currently pending before the Judiciary Committee. And they want to leak exactly what their viewing history is. And they say, but we don't want to tell you their names. So what we're going to do is you send us their names. We're going to then send you a list of 1 through 50. You send us a list of names, 1 through 50. You match up a name and a number. And we're going to send you a list. What we disclose is going to have two columns. The first column will have the number of the judge, and the second column will have the list of movies they've watched. And they say, we haven't disclosed the names, right? So it seems to me that in your argument, adopting the Third and Ninth Circuits, where you think, say, you focus exclusively on the disclosure, the information sent in one direction, and you ask whether an ordinary person, not the recipient, would be able to interpret who was watching what, in my hypothetical, there is no violation of the VPPA. So tell me first whether you agree there is or isn't a violation and why that makes sense. Well, Your Honor, that may be the way you pose it. It may be a violation of the VPPA. Why? Well, because there's a disclosure. Under your test, why is that a violation? If you focus exclusively on the disclosure, meaning the one-way communication from the streaming provider, and the test of whether an ordinary person, not just the recipient who has the answer key, but an ordinary person would be able to make heads or tails out of that. Yeah. Well, part of it, Your Honor's hypothetical, is the purpose of this is to disclose the identity of the individuals, which is very different from the way that the targeted advertising works. Purpose? No, no, no. But I'm not talking about targeting advertising. I'm saying why would you say you're saying it's the purpose? In your hypothetical. I thought we're just dealing with the definition of PII. I thought in my hypothetical, my question is, let me focus my question then. Isn't what was disclosed by Netflix, in my hypothetical, PII? And if not, why not? Under your test. Well, I think what you're saying is that the purpose of the disclosure was to identify who these individuals were. Yes. And I will say this. The ordinary purpose test is not a perfect solution. The problem is that Congress really didn't give much notice. No, no, no. But back up. I just want to play with the hypothetical for a minute because I'm trying to test the boundaries of the test. So in my hypothetical, the disclosure of the two-column spreadsheet, does that contain PII, yes or no? It has a column with numbers 1 through 50 or 1 through 100, however many nominees there are, and the second column has a list of movies. Is that PII? And Netflix knows that that will enable the disclosure. Yeah. In that circumstance, it may very well be. The reporter sent, in my hypothetical, sent a previous spreadsheet with two columns, a list of names that are matched to a list of numbers. It may very well be, Your Honor. I don't understand what that means, may, may not. Well, we can assume for purposes. Is it a yes or no? I'll assume for purposes of this discussion, yes. But I can explain why it's different than our case. No. You see, that's what I'm trying to get at. I'm trying to understand why it would be a yes or why it would be a no, not why, assuming it's yes, there's a different reason. Because I'm trying to get to the definition of PII, not assuming there's PIIs you would win for a different reason. I'm trying to get to the definition of PII. Why would it or would it not be PII? Help me with a yes or no to that. Well, it would be PII in those circumstances because there's not much investigation that needs to be done to identify the individuals. And so an ordinary person. But how would an ordinary person know that if the only person in possession of the spreadsheet is that reporter? So I thought under the Third and Ninth Circuit you look at an ordinary person test, not an idiosyncratic, the recipient test like you have the First Circuit. We say, ah, the First Circuit says, well, they have the answer key. So in my hypothetical, nobody knows the answer key except Netflix and the reporter. How does that fit into an ordinary person test? Your Honor, I don't know that I can give you a different answer, but I can go back to what the Third and Ninth Circuit said to defend the ordinary person test, which is it's the best solution that we have in the absence of more specific guidance from Congress. I'm trying to play with that hypothetical not to say ignore the hypothetical and tell me why it doesn't matter. I mean, okay. Why don't you just proceed? In coming up with the ordinary person test, they explained that they thought it was the best we could do, but why is it the best we can do to achieve the objective of the statute? I mean, the hypothetical that Judge Nardini just gave you would seem to be exactly what Congress was trying to avoid, which is someone has the viewing history and they give it to a reporter. Now, they have coded for themselves the identity of the person, but once it's disclosed, it's disclosed. That would not come under the ordinary person test. And yet, as even your responses show, there's a lot of disquiet about saying that's not what's covered. So we're trying to figure out what would be the principle that that's covered but not other situations, and to just say that the Third and Ninth Circuit thought, well, that's a better test. It's not tied to language. It's not tied to anything. Tell us why we should adopt it. Well, it's tied to the narrow purpose of the statute, and it's tied to other considerations, including, for example, that Congress did not delegate to the FTC as they did in other statutes. Go back to the narrow purpose. Yes. Because my hypothetical was tried to be keyed as neatly as possible to the Judge Bork situation. That's the tightest example I can find that varies the facts even a smidge. So if that's your argument, is that we don't want that recurring, then it seems like my hypothetical is exactly the one that needs to be covered by the VPPA if one is engaging in a purposive analysis. And I don't understand, then. Now you go up and say, well, but it's not keeping up with the technology. That's a different argument. And I don't understand that. What is your argument about purpose? Where does that come into this, that you don't want to go with something like the First Circuit test? Well, what the Third Circuit said is that the paradigm from 1988 – what we know is the paradigm from 1988, and we know the technology that existed in 1988, and we know that Congress did not ask the FTC to regulate as they did in other statutes, like the Children's Online Privacy Protection Act, where businesses are given notice in advance of what constitutes PII. Here we're essentially guessing. And so the considerations of the Third and the Ninth Circuit took into account included fair notice and the narrow purpose of the statute, which is dealing with that kind of a paradigm. And so we think that of all the choices that have been proposed, the ordinary purpose standard seems to fit the best in an imperfect situation, certainly. Can I ask you a different question? Hypothetically, let's say that we were to say that the appellant should be permitted to amend the complaint in both of the respects that they now ask us to, hypothetically. Would you agree that at least as to the question of PII and as to the prerecorded video, putting aside your alternate bases for affirmation, I know they're out there, as to those two, wouldn't the complaint survive on both of those scores, regardless of whether we adopt the First or the Third and Ninth Circuit's tests? Assuming there was an amendment? Assuming there was an amendment. Assuming she were able to say, yeah, look, my name is on the Facebook page. It has my name and all kinds of personal information, my photo, my Social Security number, my date of birth, everything personal about me you could possibly know. I would say yes as to live or prerecorded, no as to... And why is that? Tell us that. Because the other aspect of, again, applying the ordinary person test, is the nature of the disclosure of the URL. And if you look at page 8 of our brief, we've reproduced something from the complaint which shows the complexity of where this GET request was buried. It's computer code, and that's only an excerpt of it. So we don't think an ordinary person could discern from that complex computer code the title of the video. And, in fact, the plaintiffs had to... So if in that code it didn't have the Facebook ID, but instead in that buried code that's sort of in that little box in the appeal, it had her name and her birth date and her Social Security number and all that personal information, but it was surrounded by all the code, I take it your argument would be the same. You're saying it would have PII, but it would be so hard for an ordinary person to find that, even if it's got her name, rank, and serial number, it doesn't matter one bit? Is that what you're saying? If it's as difficult as it is in here to find. But what I'm actually talking about is the title of the video, which is a separate... There are actually two, quote-unquote, transmissions from the browser. One is the GET request where the titles are buried. That's the computer code in box A of the screenshot. Box B is something called C underscore user equals. So their argument is, on the ordinary person standard, is an ordinary person could take the FID and put it in a browser and find her Facebook page. The problem with that is no ordinary person would know C underscore user equals. Where is the Facebook ID? It's in box A, buried. Is that what you're saying? Your Honor, let me turn to the... I'm on page A20. No, the box A is actually the URL, the GET request. That would be the title somewhere buried in there. But if you notice, the plaintiffs had to highlight in yellow in order to even show an ordinary person what it looks like. And that's just an excerpt. These are screenshots taken from a user's browser because the communications are between the browser and MetaService. They're not between fight servers and Meta directly. Well, that gets... I mean, the definition in the statute is personal identifiable information is information which identifies a person as having requested or obtained specific video materials. And so you're saying that because it's a series of numbers and letters, the average person couldn't know that they obtained, you know, Ben-Hur versus Casablanca or anything like that. But that gets us back to why we should adopt the ordinary person test. I don't understand you to dispute that certain computer geeks could break the code without too much difficulty. And if that's the case, why aren't we in the same situation where looking to embarrass individuals or find out whatever information they think might be of interest to the public, they go about breaking the code? Your Honor, I don't think that's an allegation that the plaintiffs are offering here. And I don't think that's also not really the purpose or the way targeted advertising works. We're not asking about the purpose of... If you're looking at the purpose of advertising, that's one thing. But I thought before you were talking about the purpose of the statute is you don't want to leak what people are watching. And I thought that Judge Radji's question was if you go to, say, the First Circuit's standard and you know the recipient can decode this, then you know that they're going to be able to figure out whether they're watching Ben-Hur or Casablanca or whatever, right? Not necessarily. When you say the question, Your Honor, is who we're talking about. In terms of the way advertising through cookies works is what there's a cookie on a browser. And so that browser accesses a link to the video. That GET request is sent to MetaServers. And then with the cookie, which is a Facebook cookie, we have nothing to do with it. We don't place it. We can't access it. That then can allow Facebook to send a targeted ad to the same browser. So what we might know is user 1, 2, 3, 4, 5. The cookie on that browser visited a particular video. We don't know who that person is. We don't know necessarily that it's Judge Bork. It doesn't matter for purposes of targeted advertising. We don't care. Well, that's just how Facebook chooses to use it. But if they wanted to, they could cross-reference the Facebook ID. And instead of sending a targeted ad, they could use it in a different way. And they could send a list of videos watched to a reporter. Hang on. I asked a question. Right? Yeah, I think that, yes, the answer to that question is it's possible that, yes, they could do that. Right, and it's the disclosure from the blockbuster video clerk that would have been the violation of the VPPA, right? Not the reporter publishing it in the newspaper, right? That's correct. So it's the sending the information to Facebook that is hypothetically the violation or not. Not how Facebook, whether they choose to do something unethical or nefarious with it later. They may choose to. They may not choose to. But once you've disclosed it to Facebook, the disclosure has happened, right? I agree that disclosure has happened. Of course, we argue that we haven't disclosed anything. I know. But to be PII, the statute talks about PII only in information that itself identifies the user in the video that they've watched. That's not what we're talking about. We're talking about potentially information that might be usable. And for that, the courts have come up with different standards. But our point is that at the very least, for it to be PII, it has to be something that we would anticipate that they can identify the specific person, Judge Bork, not user 1, 2, 3, 4, 5. I think we have your argument. I have a question for you about your argument that it has to be prerecorded videos, that they have to allege that. Now, they're arguing that if they were allowed to mend, they could do that, too. But I'm a little confused as to why you think that. At that point, aren't we into the definition of videotape service provider rather than the definition of personal identifying information? That definition says any person engaged in the business of rental sale or delivery of a prerecorded videocassette tape. And there's no dispute that your client is in the business of renting, selling, or delivering prerecorded videocassette tape. So in terms of deciding, well, you know, is this prerecorded? Is this an entity to which the Act applies? I would think it applies to you. Well, we don't dispute that they've alleged videotape service provider. All right, so why do you think it also – where do you get the further requirement that the plaintiff has to allege, and I am a person who acquired prerecorded rather than live material from this entity? Because the statute applies to similar video materials. No, no, that's again in defining who is a videotape service provider, not what is protected in terms of the plaintiff's personal identifying information. And our position is that they still have to allege that in order to sue us for disclosing PII, that they've watched or the plaintiff watched prerecorded videos, not videos that don't fall within the scope like a live event. Well, let me give you a hypothetical here because your client deals in both. Correct. So is it your position that if they had alleged themselves to, you know, have personally identifying information that their Facebook page has their name, and they said that they viewed prerecorded as well as live material, and they showed that you disclosed that information to a third party, that you could only be liable for the prerecorded information disclosure? If you also disclosed their live viewing habits, you couldn't be liable under the act? Yes, that is our position, and I don't understand the plaintiff to dispute that. I think their only argument is they could fix that by alleging that the plaintiff watched it. So you think this statute allows you to disclose personal viewing habits of live information as much as you want? Your Honor, it doesn't apply to viewing live events, and obviously live events existed in 1988 and it wasn't covered by the statute. But again, maybe I didn't ask the question clearly. Isn't that part of the definition going only to who is a videotaped service provider? If you made available only live events, I understand why you would say we don't fit this definition. But where you're a hybrid and you make both available, prerecorded and live, why aren't you within the statute? Because the statute only makes a company that sells multiple things liable for disclosing similar videotaped materials, which would be prerecorded only. Well, can I just interject? You keep going back to similar audiovisual materials, and it seems to me that's, as Judge Radji is indicating, part of the definition of what makes you a videotaped service provider. I mean, is your argument really about the limitation of liability going back to the definition of PII, which is something that identifies a person as having requested or obtained specific video materials or services from a videotaped service provider? Would your argument have to be more that specific video materials and services is somehow read in pari materia with the definition of videotaped service provider? It has to fall within, your limitation of liability has to fall, it would seem to me, within that phrase, not the similar audiovisual materials, but the specific video materials or services that you would be saying, well, but the services have to be limited to the kinds of services that make you a videotaped service provider. Yes, I agree, Your Honor. I also, this argument has not been raised and has been, I think, forfeited in this, certainly in this case. Yes, I understand that. Yeah. I understand. Okay. All right, thank you very much. Why don't we hear from the appellant for two minutes of rebuttal, and we'll try to keep it to two minutes. Thanks. Thank you, Your Honor. I will be brief. I'd like to start with this issue of whether the party can gain access, an ordinary person, can they gain access to the personally identifying information if it's transmitted amidst computer code. That is not what the ordinary person test is designed to get at. The question is what is the type of information, what is the kind of information that is personally identifiable, and the Third and Ninth Circuit said it needs to be the, quote, kind of information that an ordinary person could use that would readily permit them to identify the consumer. So this idea of whether or not someone could gain access is an attempt, I think, to import an additional requirement into the statute that does not appear in the statute and it does not appear in the other circuit precedent. Well, let me ask you about that. The statute says it's information that identifies a person as having requested or obtained specific video materials. So it's the specific video materials phrase in the statute that I understand your adversary to be saying that, well, it can't just be this, you know, random numbers, letters, and asterisks, exclamation points, et cetera, because no one would know what that means except the owner of the computer program. And why doesn't the statute suggest, yes, it can't just be your name and nobody knows what you viewed. It has to be both. That's correct, Your Honor. It has to be the combination of the name or, in our case, the Facebook ID, along with the titles and the web addresses of the videos. So help us out on how you think you've adequately pleaded that they're going to be able to obtain specific video materials. Yes, Your Honor, it's because we plead that the name or the Facebook ID, rather, of the user is being transmitted by FITE to Facebook together with the titles and the website addresses of the videos. So that is enough for Facebook to identify. What's your good faith basis for thinking they're transmitting the titles as opposed to, for instance, watches musicals, watches thrillers, watches shoot-em-ups? Why do you have a reason to think they're disclosing titles as opposed to, for instance, generic type? So, Your Honor, that's where the screenshots in the complaint are important because those demonstrate our good faith basis for that belief. The screenshots show, albeit amidst a lot of computer code, those screenshots show that the titles do, in fact, appear. And that's what they're transmitting. Correct. Moving to, if I could just briefly move to two additional points, Judge Nardini, to your hypothetical, I think the answer would clearly be yes if information is sent in a sort of encrypted way or with numbers on a spreadsheet. We think that's a common sense type of situation that any reasonable definition of personally identifiable information has to capture. And the problem with the ordinary person test, as currently formulated, is that the Third and Ninth Circuits are saying that's an exclusive test. So even the transmission of information in an encrypted way to a particular recipient who could absolutely use that information under the ordinary person test, that wouldn't be captured. And so that's why we've tried to formulate a different test. Of course, this Court is free to choose not just among the three options that are presented in the briefs, but whatever this Court believes based on statutory interpretation is appropriate. I have one final point, which is to say in response to these Third and Ninth Circuit decisions, the Third Circuit recognized in the Nickelodeon case that there's a rapid change of pace to technology, and the Ninth Circuit recognized there may come a day where changes in technology mean that certain types of information are, in fact, personally identifiable information, and we would submit that that day has arrived. Can I ask a question about the ordinary person test? When you were up before, I asked you if hypothetically you were to be able to amend your complaint in both respects you've asked, would you win under either the First or the Third and Ninth Circuits test? And you said yes. So we wouldn't, I guess, in theory, need to decide that. But your opponent argues that, well, you would still lose under the ordinary person test because the ordinary person would not be able to look at the screenshot with all the computer code and be able to pull out and identify where is the title of the video. And, of course, you've highlighted it here, but I guess the counterargument is, well, the ordinary person doesn't have you there highlighting this. The ordinary person just sees all these strings and won't know what's what. Respond to that argument. Yes, Your Honor. The ordinary person test is about whether the type of information, the kind of information that's being transmitted is the kind of information that if given to an ordinary person, they could use it, it would readily permit them to identify. It's not about the method of transmission. It's not about whether an ordinary person could gain access. Could an ordinary person understand this type of information? If an ordinary person were presented with this. The boxes that are in your complaint. I'm not sure that they could, Your Honor, but that's not what the ordinary person test is about. It's about, let's say, I think going back to a hypothetical that was presented earlier, if the screenshot had the name, the social security number, the date of birth. I think that was the question that Judge Nardini just asked. Could an ordinary person make meaningful use of this information and ask for your response to that? Yes, Your Honor. If an ordinary person is presented with someone's name, date of birth, and social security number. Presented with the code as it appears in the complaint. So, again, Your Honor, I don't think that the ordinary person test is about whether presented with this, they could gain access by discerning where it appears. Hypothetically, assume that that is what the ordinary person test says. I understood the question to say, would the ordinary person be able to look at this screenshot and identify, I guess, both the PII and the name of the video? Two preliminary responses to that, Your Honor. One is that the district court did not address that issue. So if that is a concern, we believe it should go back to the district court. Second, I don't think any district court, and there have been many cases. Okay, we got the preliminaries. Now answer the, get to the meat. Look, I think that is a difficult, that's a difficult question. Could an ordinary person look at this and find that information? That's difficult, but I think that also demonstrates why that's not a good test, because if the question is. Or maybe it just shows that you lose. I mean, I don't know that it shows it's a bad, you seem to be suggesting it's a bad test because you lose. I mean, it may be bad for you. Your Honor, I think the court is presented with a somewhat difficult situation, which is how to craft a standard for how you define personally identifiable information. And that comes from first principles. But you also have to look at examples to see what the outer bounds are. And you're presented with an example here. Let me give you an example then. The sender has a file, and it just has the person's name. Your client's name, birthdate, address, phone number. And then it lists all the movies she's ever watched. And it encrypts the entire thing in an unbreakable encryption code that is accessible only by one other person. But it gets sent to a different person who does not have the encryption code. But it's in there. It's in there. It's in the file. You need the key to unlock it. But it's sent to a person that doesn't have the key, and the sender knows doesn't have the key. Has there been a disclosure? No, Your Honor. Not in that hypothetical. Okay. I have another question for you. If we don't use the ordinary person test, if we use the test you're urging, what makes this enough to satisfactorily plead that they are disclosing this kind of information? I mean, as your adversary points out in its brief, nothing in the complaint alleges where this came from or that this is the form in which it was received by META servers or shown to anyone at FITE or META that could gain access to it. So what is the basis for even thinking that this is what they're disclosing? Well, Your Honor, I believe our complaint does allege that FITE is disclosing, by using the Facebook tracking pixel, and we describe a little bit of how that technology works in the complaint and in the briefing, but by using the Facebook tracking pixel and embedding that on their website, FITE is transmitting to Facebook when someone like Ms. Solomon goes to FITE's website and watches a video via the Facebook pixel, the Facebook ID, which is the unique identifier for Ms. Solomon, along with the titles and the website addresses of the videos she's watched, that is being transmitted. Those are our allegations. I don't think that the defendant disputes that in terms of that is what the Facebook pixel does. They have arguments about, well, this is targeted advertising and it's hard to parse the computer code, but that is our core allegation. Well, you know, going back to Judge Nardini's hypothetical about 1 through 50 and the reporter has the same list of 1 through 50, at best I understand this to suggest that one side has this code, but I don't see where you've alleged that the other side has this code. The recipient has this code as well. What's the basis for that in the complaint? So, Your Honor, we are alleging that Facebook has the code, and this is a critical point. We're alleging that Facebook is the entity that assigns unique user IDs to all of its hundreds of millions, I think billions of users globally, but tens of millions in the U.S. I understand that your client has her name on, et cetera. Yes. But what's the basis for thinking that when Facebook gets this code that you say is the movie or the video, that they know what that means? Because at the same time that Facebook receives the code with the name of the video and the website address of the video, Facebook is also receiving the Facebook ID number of the person who watched the video. Right, but that tells them that your client, Detrina Solomon, watched TVN252FW at CHH252 go on, you know, more and more. How do we know that they know what video that refers to? Well, so, Your Honor, what we allege, and this is in our complaint, starting in paragraph 50 and going through into the 60, paragraph 62, 63, we have examples of the way the information is transmitted. So, and this is pled as an exemplar. It's not a specific video that Ms. Solomon watched. But, for example, these screenshots show that there is a title of a video. The example in paragraph 59 is The Roast of Ric Flair Official Replay. And that plain text title of the video is contained within the information that's transmitted. Could I ask you on that score, you have it in two ways. You have the screenshot with all the gobbledygook in paragraph 57, and then you've highlighted the name of the video. And in paragraph 59, you say, we alternatively show this in the screenshot below where it's much more easily readable in paragraph 59. But have you told us where paragraph 59 comes from? You just say, here's a screenshot. A screenshot of what? Do you say what that is? Who has access to that? What work had to be done to get that? Is that a standard software tool? So, no, Your Honor. I don't think we get into all of the details of exactly how these different screenshots were configured or why they were configured that way. And I think that's sort of outside of the issues that are presented here. But I do think that what this shows is that there was a good faith investigation done by counsel prior to finding the complaint that shows that this information is being transmitted. And technologically, it can be displayed in different ways. I can't really speak to the details of that today. I'm sorry if I'm not understanding this clearly enough, but I see in paragraph 58 where you allege that Box A was sent to Facebook. But I don't see where you say that about the screenshot that's in paragraph 59. Have I overlooked something? Yes, Your Honor. So for the paragraph 59 screenshot, we then say in paragraph 60 that in that screenshot, in this table Box A shows the subscriber access to the URL. So you can see Box A has a URL, and within that URL, which is fight.tv slash watch, it then says slash the roast of Ric Flair. So that's the title of the video. It's part of the website address. And then Box B shows the title as well. But you don't tell us how B, I'm sorry, how paragraph 59 is extracted from 57 is my point. There's definitely stuff here. Well, I don't know definitely. There's all this stuff like in the last weekend of July, two days before his last match. There's a text string in Box B in paragraph 59 labeled CD meta. It's not clear whether that is information that is extracted from the box in 57 or this is somehow a cross-reference that if one plugs in some of the data from 57, one can discover through other sources what's in 59. You haven't told us what the relationship between 57 and 59 is. I believe that's correct, Your Honor. That is a concern. I think that is best addressed by the district court. I think that depending on whether the district court has concerns about that, there may be a way for us to allege to give more detail about how one screenshot was extracted from the other. I think that is not an issue on this Court of Appeal. Whether 59 is 100% representing info that's in 57 or whether you use 57 to get more information that's represented in 59. I mean, can you represent to us what the answer to that is? Well, Your Honor, based on the way we've pled the complaint, I do think that both paragraphs 57 and 59 show that the Facebook pixel sent this information. Literally everything in Box 59 is embedded in 57, literally everything. It's just being decoded or is it cross-referenced into some tool that's pulling information from another source and then telling you all this more information about what that video is. I don't know the answer to that, Your Honor. And that's fair if you don't know the answer. I just wanted to know if you could make a representation one way or the other. I don't know the answer to that. What I will say is that the items that have been highlighted and called out in Boxes A and B in both screenshots, we allege that information was transmitted via the Facebook pixel. I can't speak to the other information in the other aspects of the screenshot. Okay. I don't think there are any further questions. Thank you both very much. Very interesting case. We appreciate it.